**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**DAVID A. TERKAY,**                          :

              **Plaintiff**          :          **CIVIL ACTION NO. 3:04-1023**

     **v.**                                  :

                                             **(CONABOY, D.J.)**
**JO ANNE B. BARNHART,**              :          **(MANNION, M.J.)**
**Commissioner of Social**
**Security,**                              :

              **Defendant**         :

## REPORT AND RECOMMENDATION

The record in this action has been reviewed pursuant to 42 U.S.C. §§ 405(g) to determine whether there is substantial evidence to support the Commissioner's decision denying the plaintiff's claim for Social Security Disability Insurance Benefits, ("DIB"), under Title II of the Social Security Act, ("Act").  42 U.S.C. §§ 401-433.


## I. Procedural Background

The plaintiff filed his application for benefits on January 7, 2003, in which he alleged that he became disabled on or about March 12, 2002 due to degenerative disc disease, bilateral carpal tunnel syndrome and severe depression. (TR. 21,121,146).

After his claim was denied initially, (TR.102-107), the plaintiff's application eventually came on for a hearing before an administrative law judge, ("ALJ"), on October 6, 2003. (TR. 42-101).   The plaintiff was represented at his hearing before the ALJ by different counsel than is

representing him in this appeal. (TR. 42).   In addition to the plaintiff's testimony, the ALJ heard the testimony of Paul Lee Orr, M.D., a medical expert and George Starosta, a vocational expert.  (Id.).

On December 10, 2003, the ALJ issued a decision in which he found that the plaintiff met the disability insured status requirements under the Act, as of March 12, 2002, the alleged onset date of disability, and continued to meet those requirements potentially through December 31, 2007; that the plaintiff had not been employed nor engaged in substantial gainful activity subsequent to his alleged onset date of disability; that the medical evidence of record established that the plaintiff suffered from degenerative disc disease, depression, a right shoulder injury, and a history of carpal tunnel syndrome and prescription medication abuse.  The ALJ found that those impairments, when considered in combination were severe, but concluded that the plaintiff did not have an impairment, or combination of impairments, severe enough to meet or equal the requirements of any of the Listing of Impairments set forth in Appendix 1, Subpart P, Social Security Administration Regulations No. 4 ("Listings").  The ALJ determined that the plaintiff's allegations regarding his limitations were not totally credible for the reasons set forth in the body of the decision.  Having been born on February 8, 1957, the plaintiff was 46 years old, and considered a "younger" individual, with a college education, and past relevant work which ranged from semi-skilled to skilled in nature and medium to heavy in exertional level.  The ALJ also determined that transferability of work skills was not an issue in this case; and that the plaintiff retained the

residual functional capacity to lift ten (10) pounds occasionally and five (5) pounds more frequently, sit for six (6) hours in an eight (8) hour workday and stand/walk for six (6) hours.  Because of his low back pain, he needs to avoid repetitive bending and twisting of the body, and due to his history of bilateral carpal tunnel syndrome, he cannot use his hands for repetitive type of work or forceful gripping.  He cannot do any heavy overhead work and because of his depression, he is limited to jobs that involve low to moderate levels of concentration.  The ALJ found that the plaintiff did not have the residual functional capacity to perform any of his past relevant work; that there were jobs which existed in significant numbers in the national economy which the plaintiff could have performed consistent with his medically determinable impairments, functional limitations, age, education and work experience; and, that the plaintiff was not disabled under the framework of Medical-Vocational Rule 201.21.  Therefore, the ALJ concluded that the plaintiff had not been under a "disability," as defined in the Social Security Act, at any time since his alleged onset date of March 12, 2002. (TR. 28-29).

The plaintiff (represented by different counsel than at the hearing and different from the instant action) filed a request for review of the ALJ's decision. (TR. 16-17).  On April 9, 2004, the Appeals Council concluded that there was no basis upon which to grant the plaintiff's request for review. (TR. 11-13).  Shortly thereafter, on May 26, 2004, the Appeals Council issued a Notice of Appeals Council Action in which it stated that the Appeals Council was setting aside their earlier decision and would consider additional

information.   However, after considering the additional medical information, the Appeals Council again denied plaintiff's request for review. (TR. 6-9). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Currently pending before the court is the plaintiff's appeal of the decision of the Commissioner of Social Security filed on May 10, 2004.  (Doc. No. 1).

## II. Disability Determination Process

A five step process is required to determine if an applicant is disabled for purposes of social security disability insurance.  The Commissioner must sequentially determine:  (1) whether the applicant is engaged in substantial gainful activity; (2) whether the applicant has a severe impairment; (3) whether the applicant's impairment meets or equals a listed impairment; (4) whether the applicant's impairment prevents the applicant from doing past relevant work; and (5) whether the applicant's impairment prevents the applicant from doing any other work.  See 20 CFR § 404. 1520.

The instant decision was ultimately decided at the fifth step of the process, when the ALJ determined that the plaintiff had the residual functional capacity to perform other jobs which existed in significant numbers in the national economy consistent with his medically determinable impairments, functional limitations, age, education and work experience. (TR. 23-24).

4

### III.  Evidence of Record

The plaintiff was born on February 8, 1957.  (TR. 28, 121 and 146).  He has a college education and his past relevant work includes work as an ironworker and operations manager at a retail store. (TR. 23, 51-52, 138,143).

The medical evidence of record establishes that the plaintiff has a remote medical history of L5-S1 discectomy more than 20 years ago.  (TR. 184).  On March 10, 1999, he underwent left shoulder arthroscopic anterior acromioplasty, and by March 18, 1999, he was able to return to light duty with restrictions.  (TR.168-73, 212).  On August 27, 2002, the plaintiff's orthopedic surgeon, Dr. Russell J. Striff, noted a continued excellent result with plaintiff's left shoulder surgery, with no evidence of deformity, mass, tenderness, swelling or crepitus, 5/5 muscle strength and negative impingement sign. (TR. 208).

In April of 2001, the plaintiff told his family physician, Dr. Tahirul Hoda, that he was depressed and anxious because his wife had left him.  Dr. Hoda prescribed Paxil and subsequently referred the plaintiff to Northern Tier Counseling. (TR. 259).   The plaintiff was seen briefly for medication management and counseling, but failed to follow through and did not respond to letters. He was discharged on November 21, 2001. (TR. 171-83).

Records from Dr. Hoda covering the period between June of 2001 and April of 2002, show that the plaintiff was treated with medication for complaints of back pain. (TR. 251-56).  On May 22, 2002, Dr. Hoda ordered an MRI of the lumbar spine which showed degenerative spondylosis in the

lower lumbar spine and moderate to severe dehydration with narrowing of the joint space at L4-L5 and L5-S1. (TR. 264). There was no evidence of focal disc herniation, disc protrusion, or significant central lumbar spinal canal stenosis. Id. In June, 2002, Dr. Hoda referred the claimant to Dr. Han Suk Koh for neurological consultation. (TR. 184).

On examination of June 20, 2002, Dr. Koh found discrete mild tenderness on percussion of the lower back. (TR.185). There was no significant limitation in range of motion and the plaintiff was able to perform tandem walking. Id. Ankle jerks could not be elicited and sensory testing, including light touch and vibration, were within normal limits in both the upper and lower extremities. Id. After reviewing the earlier MRI , Dr. Koh diagnosed lower back pain, most likely musculoskeletal, and suggested a trial of nonsteroidal anti-inflammatories and a course of physical therapy. Id. Dr. Koh did not recommend any strong pain medication such as Vicodin. (TR.186). The plaintiff refused physical therapy and voiced concern with anti-inflammatory medications. He elected to continue taking the Vicodin as prescribed by Dr. Hoda. (TR. 248).

On July 23, 2002, the plaintiff underwent an EMG/NCS of the upper extremities, which was consistent with bilateral carpal tunnel syndromes. (TR. 262-63). On September 18, 2002 bilateral carpal tunnel releases were performed. (TR.187-96). The plaintiff was noted to have thrombosed veins in both arms and his left foot, consistent with intravenous drug abuse tracks. (TR.187). He was subsequently admitted to Marworth on September 19, 2002

for medical detoxification.  (TR.197-204).

On return visit of October 1, 2002, Dr. Striff reported the surgical wounds to be healed and bilateral hand range of motion was to the distal palmar crease from full extension.  (TR. 205).  There was no thenar muscle weakness, and Dr. Striff released the plaintiff to sedentary work with simple grasping, progressing to unrestricted work with firm grasping over the following six weeks.  (TR. 206).

On October 29, 2002, the plaintiff presented to Dr. Hoda's office complaining of increasing low back and left hip pain after falling out of a tree while at work.  (TR. 245).  He was given Vicodin and Flexeril and advised to get an x-ray of the lumbosacral spine, left hip and left femur. (TR. 248).

On December 14, 2002, the plaintiff was found unresponsive at the K-Mart store where he was employed. (TR. 223).  He admitted to "milking" the gel from the duragesic patch, which he subsequently injected. Id.  The injection appeared to have a very short effect, and he was discharged from the emergency room of Robert Packer Hospital on the same date.  (TR. 223-24).

On January 5, 2003, the plaintiff presented to the emergency department of Memorial Hospital in Towanda with complaints of leg and back pain.  (TR. 239).  He indicated that he had a snow removal business and had been shoveling snow. Id.  He was given an injection of Toradol and released. Id.  On January 20, 2003, Dr. Hoda referred the plaintiff to Dr. Burdett Porter in the pain department of the Guthrie Clinic. (TR. 276-79).   Dr. Porter

administered an epidural injection on January 29, 2003. (TR. 277).

In February of 2003, the plaintiff came under the care of a neurosurgeon, Dr. Erik Gregorie, for his low back pain and left lower extremity discomfort. (TR. 322-29).  On examination, Dr. Gregorie reported a mildly positive straight leg raise in the left leg only and an absent left ankle reflex. (TR. 324).  Lower extremity strength was 5/5 for hip flexion, knee flexion and extension, ankle dorsiflexion and plantar flexion bilaterally and sensation was grossly within normal limits to soft touch throughout all dermatomes.  (TR. 327).  Dr. Gregorie prescribed a Medrol Dosepack, Norco and Colace, however, the plaintiff 's insurance company denied the prescriptions because the plaintiff had had three prescriptions written and filled at various pharmacies over the previous ten days.  (TR. 326-28).  Dr. Gregorie ordered another MRI of the lumbar spine, which demonstrated a left sided inferior disc extrusion at L4-L5. (TR. 329).

The plaintiff returned to Northern Tier Counseling in February of 2003. He described considerable conflict in the relationship with his wife, and indicated that he was taking Paxil, Wellbutrin and Vicodin.  (TR. 386-401).  On mental status examination of February 11, 2003, a staff psychiatrist, Dr. Eugene Pilek, reported that the plaintiff was oriented as to person, place and time; his recent and remote memory were unimpaired.  (TR. 398).  His insight and judgment were fair and his intelligence was estimated to be average.  Id The plaintiff denied any suicidal ideation and Dr. Pilek diagnosed the plaintiff with major depression (non-psychotic) and an adjustment reaction with

depressed mood. Id. Dr. Pilek recommended that the plaintiff continue taking Wellbutrin and increase his Paxil dosage to 50 mg. (TR. 397-401).

On March 1, 2003, the plaintiff presented to the emergency room of Robert Packer Hospital with a complaint of difficulty urinating. (TR. 306). He reported that he had helped a friend rip down a shed the day before and did a fair amount of slinging and lifting, with some increase in his back discomfort. Id. His urinalysis was normal and he was advised to continue with his usual medications. (TR. 306-07).

On March 6, 2003, the plaintiff underwent an L4-L5 lumbar laminotomy, foraminotomy and discectomy. (TR. 310-11). On return visit of April 7, 2003, he told Dr. Gregorie that he still had some discomfort in his back with decreased range of motion, but did not have the leg pain that he had prior to surgery. (TR. 322). On July 29, 2003, Dr. Gregorie completed a form for the welfare department indicating that the plaintiff was temporarily disabled from February 6, 2003 until October 6, 2003, due to diagnosis of status post L4-L5 discectomy with back and right paraspinal pain. (TR. 342-43).

When the plaintiff returned to Northern Tier Counseling on April 14, 2003, he reported that surgery had helped his back. (TR. 392). He was continuing to have problems in his relationship with his wife and Dr. Pilek suggested that he discontinue the Wellbutrin and Paxil, and start Effexor. Id. At the time of his next appointment on May 14, 2003, the plaintiff stated that he had stopped the Effexor on his own and Dr. Pilek prescribed a trial of Lexapro and Vistine. (TR. 391). The claimant failed to show for an

appointment on June 11, 2003, and on August 21, 2003, Dr. Pilek noted that the Lexapro had been helpful in improving the plaintiff's mood and anxiety. (TR. 388-90).

On October 2, 2003, Dr. Pilek completed a Psychiatric Review Technique Form at the request of plaintiff's attorney. (TR. 346-59).  Dr. Pilek opined that the claimant's activities of daily living and concentration were moderately restricted, and that the plaintiff had marked difficulties in maintaining social functioning.  Id.

## IV.  Discussion

In support of his appeal, plaintiff presents several arguments. The plaintiff first argues that the ALJ was in error when she failed to give special significance to the treating source opinions of Dr. Erik Gregorie and Dr. Eugene Pilek.  Next, the plaintiff states that the ALJ failed to properly address plaintiff's testimony regarding his usual daily activities.  Additionally, plaintiff asserts that the ALJ failed to properly address plaintiff's work history.  Finally, plaintiff states that the ALJ failed to consider the plaintiff's combination of impairments in the hypothetical questions to vocational expert.

### A.   *WHETHER THE ALJ ERRED BY FAILING TO GIVE SPECIAL SIGNIFICANCE TO THE OPINIONS OF THE PLAINTIFF'S TREATING PHYSICIAN.*

The plaintiff argues that the ALJ improperly substituted her own opinions for that of the plaintiff's treating physicians without providing a sufficient explanation.  The defendant maintains that the ALJ's decision to give less

weight to the opinions of Dr. Gregorie and Dr. Pilek was supported by substantial evidence and should be affirmed.

The ALJ is required to evaluate every medical opinion received. 20 C.F.R. § 404.1527(d). Although he must consider all medical opinions, the better an explanation a source provides for an opinion, particularly through medical signs and laboratory findings, the more weight the ALJ will give that opinion. 20 C.F.R. § 404.1527 (d). Automatic adoption of the opinion of the treating physician is not required. See Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991).

In order to be entitled to controlling weight, a treating physician's opinion must be "well supported by medically acceptable clinical and laboratory diagnostic techniques" and must not be "inconsistent with the other substantial evidence" in the record. 20 C.F.R. §404.1527(d)(2).

In Jones v. Sullivan, 954 F.2d 125 (3d Cir. 1991), the court held that, in the absence of contradictory medical evidence, an administrative law judge must accept the medical judgement of a treating physician. However, the court also noted that these opinions need not be accepted where they are conclusory and unsupported by the medical evidence or where the opinions are contradicted by the opinions of other physicians, including state agency physicians, who reviewed the findings of the treating physicians and concluded that these findings do not reveal a condition that would preclude gainful employment.

In Williams v. Sullivan, 970 F.2d 1178 (3d Cir. 1992), the court noted

11

that while the administrative law judge may not base a decision upon his own interpretations of the significance of medical data, this does not prevent the administrative law judge from weighing medical reports against internal contradictions and other contradictory medical evidence.

The plaintiff argues that it was erroneous for the ALJ to reject the opinions of Dr. Pilek that the plaintiff suffered from chronic insomnia, appetite disturbance, thoughts of suicide, that his social functioning was marked and that he had a depressive reaction to his physical problems. (Doc. 10, p. 9, 70, 74).   The defendant argues that Dr. Pilek's opinion that the plaintiff was disabled because his impairments met a listed impairment is "legally inaccurate." (Doc.11, p.17).

Dr. Pilek opined that plaintiff had impairments that met or equaled Listings 12.04 (affective disorders) and 12.09 (substance addiction disorders). The ALJ rejected Dr. Pilek's opinion that the plaintiff's impairments met the requirements of any of the Listings.   The ALJ found that this opinion was inconsistent with Dr. Pilek's own treatment notes. (TR. 26).   The ALJ acknowledged that the plaintiff's depression was of a chronic nature, but that the condition was present even before he stopped working.  The plaintiff was not dilligent in follow-up appointments or with medication compliance.  (TR. 390, 393-94).

On May 14, 2003, the plaintiff stated that he had stopped taking Effexor on his own and Dr. Pilek prescribed a trial of Lexapro and Vistine.  (TR. 391). The plaintiff failed to show for an appointment on June 11, 2003 and on

August 21, 2003, Dr. Pilek noted that the Lexapro had been helpful in improving plaintiff's mood and anxiety.  A report by Dr. Pilek dated October 30, 2003, noted an increase in the plaintiff's depressive symptoms, but indicated that the plaintiff had either discontinued or run out of Lexapro several days earlier. (TR. 386).  The ALJ found that the plaintiff had, at most, moderate problems with depression and can perform work requiring low to moderate levels of concentration.  (TR. 26).

At the hearing, Dr. Orr testified and stated that Dr. Pilek's opinions was not supported by any clinical observation notes or other documentation. (TR. 70-71).  Dr. Orr opined, contrary to Dr. Pilek's assessment, that the record establishes that the plaintiff did not meet or equal a listed impairment.  (TR. 71).  The plaintiff suggests that it was erroneous for the ALJ to rely on Dr. Orr's testimony to reject Dr. Pilek's opinion because Dr. Orr was merely a psychiatric consultant. (Doc.10, p.10).  However, the Regulations provide that the ALJ had the authority to rely on the opinion of Dr. Orr in rejecting Dr. Pilek's opinion.  20 C.F.R. § 404.1527(f)(2)(iii)(2004).

In rejecting Dr. Pilek's opinion, the ALJ also considered plaintiff's failure to consistently require mental health treatment in assessing his mental limitations. (TR. 26).  The plaintiff first stopped seeing Dr. Pilek in September, 2001, before the alleged onset of disability in March, 2002. (TR.174-75).  He did not resume mental health treatment until January, 2003. (TR. 304).  When the plaintiff was actively seeking treatment, he missed several of his scheduled appointments with Dr. Pilek. (TR. 390, 393-94).  Additionally,

plaintiff refused a referral for counseling for his depression, relying instead solely on medication checks with Dr. Pilek.  (TR. 25, 26, 389).  The ALJ found that Plaintiff's minimal treatment for depression suggests that he was not limited by his mental impairments to the extent suggested by Dr. Pilek.  (TR. 26, 72).

Dr. Kowalski, a state agency physician, also opined that the plaintiff's impairments did not meet or equal a listed impairment. (TR. 291).   State agency medical consultants are "highly qualified" physicians and "experts in the evaluation of the medical issues in disability claims under the Act, and their opinions are entitled to weight. See Social Security Ruling 96-6p and 20 C.F.R. §§ 404.1527(f), 416.927(f).  Specifically, in reference to § 12.04 of the Listings, Dr. Kowalski determined that the plaintiff suffered only mild limitations in his activities of daily living, maintaining social functioning and in maintaining concentration, persistence and pace.  (TR. 298).  He opined that the plaintiff suffered no episodes of decompensation.  Id.  Regarding the "C" criteria of the Listing, Dr. Kowalski found that the evidence did not establish the presence of the "C" criteria.  Dr. Kowalski stated that while the plaintiff's allegations were partially credible, he found that his limitations did not significantly limit his functioning. (TR. 300).

We agree with the defendant that the ALJ's finding as to plaintiff's limitations was not based on his lay opinion, but on a reasoned assessment of all of the medical and other evidence of record.  Substantial evidence supports this finding.

14

Dr. Gregorie, the plaintiff's treating neurosurgeon, opined that the plaintiff was disabled from December of 2002 through October of 2002. (TR. 320, 343). The ALJ gave this opinion little weight because it did not establish disability for purposes of SSI evaluation. (TR. 26). In order to be disabled for purposes of SSI, a claimant must be unable to work for a continuous period of twelve months. 42 U.S.C. § 1382c(a)(3)(A). A temporary incapacity of less than twelve months does not satisfy the regulatory definition of disability. Id. Therefore, the ALJ stated that, "no weight is given to Dr. Gregorie's opinion" in assessing whether plaintiff was disabled for SSI purposes. (TR. 26).

While a treating physician's opinion regarding disability is not binding on the Commissioner, here Dr. Gregorie's conclusion of disability was inconsistent with other evidence in the record. 20 C.F.R. § 404.1527(e)(1)(2004). On October 1, 2002, Dr. Striff estimated that the plaintiff could perform "sedentary" work with "simple grasping." (TR. 206). Similarly, on January 30, 2003, a state agency physician determined that the plaintiff could perform a full range of medium work. (TR. 280-87). The Regulations provide that, "if someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

Finally, Dr. Gregorie's opinion was inconsistent with the objective clinical findings contained in the record. A treating physician's opinion is entitled to less weight if it is not well supported by objective medical findings. 20 C.F.R. § 404.1527(d)(2). Numerous reports indicate that the plaintiff had normal strength, sensation, and range of motion on most examinations. (TR.185, 201,

207-8, 247, 303, 323, 327).  He was able to twist, bend, flex and extend his lower back; perform tandem walking; heel and toe walk; and stand on his heels and toes. (TR.185, 327. 270, 279).  While plaintiff did show some weakness and abnormal sensation of the left leg, later testing showed that these abnormalities were resolved. (TR. 303, 323-24, 327).  In fact, plaintiff denied leg symptoms after his back surgery. (TR. 322).  The minimal, and short-term abnormalities found on clinical examinations undermine Dr. Gregorie's position that plaintiff was disabled by his impairments.  Substantial evidence supports the ALJ's decision not to award Dr. Gregorie's opinion any weight.

**B.** ***WHETHER THE PLAINTIFF AWARDED PROPER WEIGHT TO THE PLAINTIFF'S SUBJECTIVE COMPLAINTS.***

The plaintiff argues that the ALJ made improper credibility judgments about the plaintiff that were not based on substantial evidence. (TR.12).  The plaintiff relies on Morales, which established that an ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.  225 F.3d 310, 317 (3d Cir. 2000).  However, as the defendant sets forth in her brief, the ALJ had the authority to consider plaintiff's daily activities in assessing whether his subjective complaints were credible.  20 C.F.R. § 404.1529(c)(3)(i)(2004) ; SSR 96-7p.

The Social Security Regulations provide a framework under which a plaintiff's subjective complaints are to be considered.  20 C.F.R. § 404.1529.

First, symptoms, such as pain, shortness of breath, fatigue, *et cetera,* will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. § 40431529(b). Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant*s ability to work. 20 C.F.R. § 404.1529(b). In so doing, the medical evidence of record is considered along with the claimant's statements. 20 C.F.R. § 404.1529(b). Social Security Ruling 96-7 gives the following instruction in evaluating the credibility of the claimant's statements regarding her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p. "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness' demeanor and credibility." *Walters v. Commissioner of Social Sec.,* 127 F.3d 525, 531 (6th Cir. 1997); *see also Cassias v. Secretary of Health & Human Services.,* 933 F.2d 799, 801 (10th Cir. 1991) ('We defer to the ALJ as trier of fact, the individual

17

optimally positioned to observe and assess witness credibility,')." *Frazier v. Apfel,* 2000 WL 288246 (E.D.Pa. March 7, 2000).

The ALJ considered the plaintiff's subjective complaints pursuant to 20 C.F.R. § 404..1529 (c)(3)(I) and SSR 96-7p.  The ALJ noted that at the hearing, the plaintiff testified that he had been laid off from his job at K-Mart due to a cut back in personnel, and subsequently underwent bilateral carpal tunnel surgery and a lumbar discectomy.  He was scheduled to start a course of physical therapy and Dr. Gregorie had restricted him to lifting a maximum of ten pounds, with limited bending and twisting of the body.  (TR. 51).  The plaintiff had no restrictions insofar as his hands were concerned, but stated that sometimes he dropped things.  (TR. 87,137).  The plaintiff stated that he had been attending to Northern Tier Counseling on and off for three years and was seeing a drug and alcohol counselor on a weekly basis.  (TR. 58).  He underwent inpatient detoxification for his prescription drug abuse and now attends AA meetings on a daily basis.  He estimated that he could walk ½ mile, sit for 45 minutes at a time and be on his feet for 45 minutes at a time. He testified that, on a typical day, he drove his six year old son to school, did some laundry and light cleaning in the house and sometimes shopped for groceries.  (TR. 62-64,90).  He went out to dinner occasionally with his wife and had recently gone to the movies with his son. (TR. 63).  The plaintiff denied any problems with his short term memory and indicated that he read medical books about his condition.

The ALJ found that the plaintiff has impairments that can reasonably be

expected to produce some of the pain and limitations alleged, but that the stated severity of his symptoms is disproportionate to the objective evidence. The ALJ determined that the plaintiff's daily activities, which included reading and driving, indicated that he retained sufficient cognitive functioning and concentration to perform unskilled work that does not require more than low to moderate concentration. (TR. 27).  In June of 2002, the plaintiff refused physical therapy for his back, which the ALJ determined suggested that his pain was not as severe as alleged.  Records from Northern Tier Counseling show that he was not diligent about his follow up appointments.

Additionally, the plaintiff reported engaging in vigorous activities on several occasions during the alleged period of disability.  In October, 2002, the plaintiff fell out of a tree while at work. (TR. 245).  In January, 2003, plaintiff re-injured his back while shoveling snow. (TR. 239).  The plaintiff admitted to being "involved with snow removal" throughout the winter preceding his January 2003 injury. (TR. 278).  This activity post-dates the plaintiff's alleged onset of disability in this case. (TR. 121).  In March, 2003, the plaintiff helped a friend "rip down a shed." (TR. 25,26).

We find that substantial evidence supports the ALJ's finding that the severity of the plaintiff's limitations, as he alleged, were not fully supported by the objective evidence in the record.

### C.  *WHETHER THE ALJ PROPERLY ADDRESSED THE WORK HISTORY OF THE PLAINTIFF.*

The plaintiff argues that the ALJ erred in failing to accord much credibility

to the plaintiff's claim that he is no longer able to work because of his conditions.  The plaintiff asserts that he consistently worked from 1978 until 2002 and that therefore, his testimony about his work capabilities should be accorded substantial credibility.  Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979).  The plaintiff was employed as an iron worker between 1978 and 1988, at which time he began college.  In 1992, the plaintiff completed his coursework and accepted a position at K-Mart, where he was employed until 2002.

In 2002, the plaintiff was laid off.  However, the ALJ noted that the plaintiff lost his job due to a cut back in personnel.  In fact, the plaintiff's own testimony establishes that he left K-Mart as a result of restructuring "when K-Mart started cutting back and closing stores." (TR. 77).  The plaintiff also testified that he had had some disagreements with the district manager.  (TR. 77).  The defendant maintains that the plaintiff's testimony as to why he left his job at K-Mart supports the ALJ's finding that the plaintiff's allegations of disability were not totally credible.  See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)(affirming an ALJ's reliance on the fact that the plaintiff had left his past job due to fights and layoffs and not his impairments, in finding his subjective complaints not credible).

The plaintiff  was laid off in March, 2002, the time he alleges he became disabled, however he continued to work. In May of 2002 the plaintiff began running a landscaping business with his wife and continued to operate it until June or July of 2003.  (TR. 92-93).  The plaintiff testified that he injured his

back during that time.  (TR. 92).  As discussed above, in October of 2002, the plaintiff reported falling out of a tree "at work."  (TR. 245).  In January, 2003, he reported that he had been involved in snow removal throughout the winter.  (TR. 239, 278).

We agree that the plaintiff has worked for a long period of time.  The problem is that the plaintiff continued to work in physically demanding occupations after the date that he claims he became disabled.  Therefore, in this case, the plaintiff's work history does not serve to bolster his testimony regarding his limitations.  Accordingly, we find that the plaintiff's work history supports, rather than undermines, the ALJ's finding that the plaintiff is not disabled.

### D. *WHETHER THE ALJ'S HYPOTHETICAL QUESTION POSED TO THE VOCATIONAL EXPERT INCLUDED ALL OF THE LIMITATIONS THAT WERE SUPPORTED BY THE RECORD.*

The plaintiff's final argument is that the ALJ failed to consider all of the plaintiff's limitations in the hypothetical questions to the vocational expert ("VE").  Plaintiff asserts that the ALJ erred by not including absenteeism due to sleep disturbance, chronic insomnia and the plaintiff's need to attend physical therapy, mental health counseling and AA meetings.  (TR. 51, 58, 64, 69).

The Third Circuit has held, with respect to hypothetical questions posed to vocational experts, that "[w]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered

for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments."  Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).  A hypothetical question posed to a vocational expert "must reflect all of a claimant's impairments."  Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).  In Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002), the Third Circuit stated that "[w]here there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence." (citations omitted).

When an ALJ's hypothetical question to the vocational expert sets forth the plaintiff's limitations as supported by the record, the vocational expert's testimony may be accepted as substantial evidence in support of the ALJ's determination that the plaintiff is not disabled.  Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).

Here, when questioning the VE, the ALJ asked the VE to consider an individual with the same age, education and work experience as the plaintiff, who could lift ten pounds occasionally and five pounds more frequently, sit for six hours in an eight-hour workday and stand or walk for six hours.  The ALJ noted that because of his low back pain, the plaintiff needs to avoid repetitive bending and twisting of the body and due to his history of bilateral carpal tunnel syndrome, he cannot use his hands for repetitive type work or forceful gripping.  He cannot do any heavy overhead work and because of his depression, he is limited to jobs that involve low to moderate levels of

22

concentration.  Considering these factors, the VE testified that a number of jobs existed that a person with such limitations could perform.

For the reasons set forth throughout this report, we find that the plaintiff's RFC, as determined by the ALJ, is supported by substantial evidence.  It appears that the ALJ incorporated all of the plaintiff's limitations that were supported by the record and therefore, the VE's testimony serves as substantial evidence that the plaintiff is not disabled.

## V.    RECOMMENDATION

Based on the foregoing, it is recommended that the plaintiff's appeal from the decision of the Commissioner of Social Security be **DENIED**.

s/Malachy E. Mannion

**MALACHY E. MANNION**
**United States Magistrate Judge**

**Dated:**   March 14, 2005

O:\shared\REPORTS\2004 Reports\04-1023.final.wpd